IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARK FALCONE,
       Plaintiff,

v.                                    Civil Action No. 2:08cv78
                                      (Judge Robert E. Maxwell)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
       Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Mark Falcone ("Plaintiff") originally filed applications for DIB and SSI on May 8, 2006, alleging disability as of December 8, 2003, due to mental impairments-- particularly bi-polar disorder (R. 138). The applications were denied initially and on reconsideration. Plaintiff requested an administrative hearing, which Administrative Law Judge ("ALJ") Randall W. Moon held on September 13, 2007. Plaintiff, represented by counsel, testified, along with Vocational Expert Eugene Czuczman ("VE"). ALJ Moon issued an unfavorable decision on November 6, 2007 (R. 22). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.



## II. Statement of Facts

Mark Falcone ("Plaintiff") was born on July 1, 1959, and was 48 years old at the time of the Administrative Hearing (R. 28). He has a high school education concurrent with some vocational training. His past relevant work experience includes being a laborer and machine maintenance repairer for a tobacco company (R. 36-43, 61).

On November 6, 2003, Plaintiff presented as a crisis walk-in to psychologist Marilyn N. Brady, Ph.D. He had recently been suspended from his job of 22 years for alleged sexual harassment, which he denied (R. 263). On this date he was arrested and charged with domestic battery when someone saw him grab his nine-year-old daughter by the neck while yelling at her to stop "playing in the mud." He admitted he yelled at his kids "all the time, but they need it." He would also "beat their ass" when they misbehaved, but denied hurting them. He was tearful about how sorry he was that he grabbed his daughter by the neck, stating that he "should have grabbed her arm." He denied having an anger or impulse control problem, but admitted to being under a lot of stress. His wife had filed a protective order against him, saying he was "too hard on the children." He had spent two days in jail. He had a hearing the next day on the protective order and was "concerned to have a note indicating that he had come in for services, as he believed that this is what his wife will require in order to drop the protective order." He was referred to an anger management group, and said he would consider a psychiatric evaluation, but did not want "to take medications 'for the rest of [his] life.'"

Dr. Brady noted Plaintiff's interpersonal style "was to lean close to this evaluator and try to touch my arm. He became very embarrassed when asked to back away, which I had to do several times during the interview." On a scale of 1-10 (10 being most severe), Dr. Brady found Plaintiff's

orientation, speech, appearance, thought content, and memory within normal limits at 1, but found his sociability inappropriate at a level 8.

On mental status examination, Dr. Brady noted Plaintiff had exhibited hostility at an acute/crisis level for the past year; mild violence for the past 1 to 90 days; severe oppositional behavior for the past year; moderate impulsivity for the past year; moderately poor judgment for the past year; moderate crying for the past 1 to 90 days; and severe mania for the past year. Plaintiff said he had suffered these problems for 20 out of the past 30 days. Dr. Brady opined that Plaintiff's psychological or emotional problems were "severe," at a level 7 out of 9. The psychologist diagnosed Adjustment Disorder, Disturbance of Conduct, and a current Global Assessment of Functioning ("GAF") of 50.[1]

Plaintiff was incarcerated on December 7, 2003, for violating his protective order. He was sent to the Belmont County Jail.

On December 17, 2003, Plaintiff was referred for psychiatric evaluation by a Belmont Community Mental Health pre-screener who saw him at the Belmont County Jail. He was referred due to his bizarre behavior while in the jail, which had made numerous fellow inmates feel unsafe in his presence. The inmates conveyed to jail officers that Plaintiff was dangerous to them, to his family, and to himself. He was very intrusive, invading the space of others and touching others, especially females. Plaintiff had to be secluded from other inmates. He was observed smearing feces in his cell. The pre-screener believed Plaintiff might be manic and possibly psychotic and referred

---

[1] A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

him for psychiatric evaluation.

The psychiatric evaluation indicated Plaintiff had no history of psychiatric treatment. He had recently experienced a series of set backs beginning with being fired from his job of 22 years due to a sexual harassment charge. Approximately two weeks later, he was observed choking his nine-year-old daughter at a public park. This was reported to his wife, who then filed for a protective order. Plaintiff violated the protective order several times during the month of November, including one occasion when he tried to run his wife and children off the road when they were driving in separate vehicles. He was incarcerated at Belmont County Jail on December 7. After serving 30 days, he was to be extradited to Moundsville, where he faced additional charges of domestic violence. He was currently on probation for growing marijuana two years earlier.

At the psychiatric evaluation, Plaintiff told the psychiatrist he did not do any serious harm to others. Plaintiff's wife stated, however, that he was temperamental and abusive. She said that one or two years earlier he had held a gun to her head, and she knew he had also held a gun to the head of a previous wife. He was facing domestic violence charges for choking his nine-year-old daughter (R. 177). Plaintiff readily admitted frequent use of marijuana, and appeared to state he would continue using it no matter what. He denied other drug use, but his wife said he had used cocaine on occasion, and that he had hung out for the past year with a group of hard drug users.

The psychiatrist diagnosed Plaintiff with Bipolar Affective Disorder, NOS, Presently Manic; Rule Out Impulse Control Disorder, NOS; Cannabis Abuse; History of Alcohol and Possible Cocaine Abuse (as reported by patient's wife); and Antisocial Personality Disorder - - Severe. His GAF was assessed at 25[2] (R. 176).

---

[2]A GAF of 21-30 indicates **Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes

Plaintiff was admitted to the mental hospital as a police hold and placed at Level I with escape precautions. After a couple of days the precautions were dropped. Early in his admission he was started on Lithium, and a few days later on the antipsychotic medication Risperdal. Plaintiff appeared to have a history of and demonstrated symptoms of hyperactivity, increased energy level, increased irritability, and intrusiveness. He would intrude into the space of others, sitting uncomfortably close to them, desiring to touch them (especially women), as much as possible, and he would get into the papers and notes of staff members seated at a table with him. He had odd mannerisms and odd facial gestures and very intense eye contact. Initially his speech was more rapid but this decreased after a few days. He monopolized the telephone and had to be required by staff to leave the telephone for other peers.

Plaintiff consistently denied any wrongdoing on his part. He denied the charge of sexual harassment, stating that he never touched the woman and saying it was well known she would hire in at different companies and then make accusations in order to try to receive money. He claimed he didn't choke his daughter, but only grabbed her by the back of the neck and yelled at her for playing in the mud. The girl told her mother he had choked her, but he said the girl was lying. Nonetheless, eye witnesses stated he had her pressed against the car and was choking her. He violated the order of protection several times, including once forcing his wife off the road in order to talk to her. He displayed impatience and a need for immediate gratification. He repeatedly asked for higher privilege levels, even after it was explained to him that as a police hold he was not entitled to these privileges.

––––––––––––––––––––

incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends).

The psychiatrist reported:

> Due to the patient's tendency to present himself in the best possible light, minimize any wrong doing and to simply not acknowledge events that were ascribed to him by reliable sources, one never did have a feeling that he was being truthful in his reporting. During the admission he had stated he was having contact over the telephone with his wife, although he denied calling her. Staff confirmed that he was not calling her home phone number. He would be seen on the phone multiple times during the day, even monopolizing the phone, but apparently many of these times he did not establish contact. Later in his admission, when he began to fear that this information might find its way to the legal authorities, he flatly denied having any contact with his wife on the telephone. Thus he was seen as somewhat manipulative. Early in the admission he had stated that if the hospital days could not count as jail time then he wasn't interested in staying in the hospital and wanted to return to the jail in three days and there was nothing anybody could do about it. Once it was ascertained that the hospital time did count as jail time, he was content to stay in the hospital and even preferred it. As he had made some clinical progress with noticeable decrease in irritability, decrease in hyperactivity, decrease in impulsivity, and appeared to be calmer and was tolerating his medications, it was decided to discharge him back to Belmont County Jail after nine days at the hospital.

(R. 179).

Upon discharge, the psychiatrist opined that Plaintiff was alert and fully oriented, cooperated, and did not display any psychomotor symptoms. Speech was normal rate. He slept four hours per night. His mood was fairly good and affect was reactive. Odd mannerisms such as insistent gaze and odd facial gestures were still noted. Nonetheless he did not appear to be overtly psychotic and denied hallucinations. Thought processes were goal directed but sometimes hard to assess due to his manipulativeness. He still minimized any involvement with illicit substances or anything illegal or wrong doing on his part. He tended to externalize blame on others or circumstances for his situation. The most he would admit was to doing some stupid things in his life, but when asked just what these were he was very vague and evasive. He appeared to have little insight into his condition and his judgment was impaired.

Psychiatric aftercare was to be determined by Belmont Community Mental Health. Plaintiff

was discharged to Belmont County Jail, with no restrictions on diet or activity. He was encouraged to take his medication as prescribed and to refrain from alcohol, cannabis or other illegal drugs. His discharge diagnosis was Bipolar Affective Disorder, NOS; Alcohol and Cannabis Abuse; Rule Out Cocaine Abuse; and Antisocial Personality Disorder. His GAF was assessed at 45. His prognosis remained guarded because Plaintiff "lack[ed] insight into his mental illness and is completely in denial of some of the events of his life as well as minimizing use of illicit substances and externalizing blame for his situation on others" (R. 180).

At some point while Plaintiff was incarcerated, Plaintiff requested he be taken off his Lithium. He reported the psychiatrist discontinued his Lithium approximately three months earlier and he was "feeling great." He admitted to "mental confusion" but was not able to elaborate what he meant by this (R. 191). He was seen on February 23, 2005, at the request of the medical staff. Objectively, Plaintiff exhibited rapid speech, labile affect, elevated mood, quick periods of aggressive behavior followed by elevated "happy" mood, and then crying briefly before laughing again. The psychologist opined that Plaintiff appeared "[h]ighly manic even though he sees no need to be placed back on medication." The psychologist referred Plaintiff to psychiatry for their expertise in Plaintiff's condition.

On March 29, 2005, Plaintiff was referred by his case manager due to being fired from his prison kitchen job "due to arms flailing about and possible safety issues." Plaintiff also reportedly wrote his wife stating they would "die together." Plaintiff denied suicidal or homicidal ideation. He said that when he told his wife they would die together, he only meant that they would grow old together and live a long life together. He stated his wife was in the process of divorcing him but he had no animosity toward her. Plaintiff said he was fired from the kitchen for making a mess while

trying to make coffee. The psychologist found Plaintiff less manic than the last time he met with him. When confronted with his bipolar symptoms and pattern of the disorder, Plaintiff still refused to be referred for medication.

On May 18, 2005, the psychologist followed up with Plaintiff. He reiterated that Plaintiff's wife said he had written her letters indicating they would "die together" and that Plaintiff was recently terminated from kitchen duty "due to arms flailing about and possible safety issues" (R. 190).

An August 25, 2005, progress note states that Plaintiff had a history of bipolar disorder and was treated with Lithium. He had not been on medication for several months. Although he appeared manic the first time seen, he became progressively more stable despite not being on medications. Plaintiff stated that he he did not believe he needed to be on medications, but was willing to go back on them if the psychiatrist felt they were needed.

Upon mental status exam, Plaintiff's affect was broad, mood was euthymic, speech was normal and psychomotor activity was normal. He was fully oriented. His concentration and memory were intact. He denied any homicidal or suicidal ideations. The psychologist opined that Plaintiff was currently maintaining stability with no evidence of mania or depression.

On January 12, 2006, Plaintiff denied taking any medication (R. 181). He drank two to three beers per week, and used marijuana once per week. He denied any other illegal drugs. He claimed he had been treated at Cambridge Mental Hospital in 2003, because "I always wanted to see what it was like."

On Mental Status Exam, Plaintiff was disheveled. Rapport was easily established. His hygiene was fair and his eye contact good. His affect was broad and appropriate. His mood was

euthymic and speech was normal. There was no evidence of hallucinations or delusions. He was fully oriented and his memory and concentration were intact. His judgment was impaired and his insight was poor. Plaintiff stated he wanted to be put back on Lithium before discharge. He was referred to psychiatry for follow-up.

Plaintiff filed for SSI and DIB on May 8, 2006. On May 25, 2006, a Social Security Administration employee conducted a claim interview with Plaintiff by phone (R. 135). The employee observed:

> He [Plaintiff] was cooperative on the phone. He didn't have any trouble answering questions for me but he doesn't have many medical sources either. He said he hasn't taken any Lithium medicine for 3 years because none of the jail facilities would give it to him. He said he didn't understand this "bipolar" disorder and doesn't know how it affects him.

When asked how his condition limited his ability to work, Plaintiff told the interviewer:

> He has a bad attitude. When he was previously incarcerated, the jail sent him to a mental health facility and they diagnosed him as bi-polar. He doesn't understand the condition and doesn't know if it would prevent him from working.

Plaintiff also told the interviewer he was fired from his job in August 2003, due to sexual harassment.

On June 16, 2006, Plaintiff contacted the SSA District Office by phone. The notes of this call are as follows:

> Claimant called from a pay phone. When asked to describe his current symptoms and explain how his impairment affected him, he answered "nothing." He reports he has no symptoms of bi-polar disorder. Reports he was diagnosed 1 ½ years and 7 months ago while incarcerated. Denies past hospitalizations. Denied current treatment. Reports not taking any medications or seeing a counselor. Was diagnosed in Cambridge Mental Hospital where he was transferred from Belmont County Jail on 12/03 after being arrested. Denies currently working and reports spending all day trying to find a job.
>
> ADLs: Reports being able to care for own hygiene, needs, make his bed and can cook

9

but currently is homeless and lives at the Salvation Army in Belaire Ohio. Reports he can make change, use a checkbook, and follow directions but does not know how to use a computer. Spends a typical day by getting up at 5am, eating breakfast, and spending the day until 4:30 pm looking for work and filling out applications. Reports he has to be at the Salvation Army by 4:40 and sits on the picnic table until he goes to bed about 7pm. Denies reading or watching TV. Visits with friends about 2-3x per week. Reported no problems with past co-workers or bosses and was able to complete job tasks on time without supervision.

Reports he was incarcerated from 2/03 to 5/3/06 without interruption. Started out at Moundsville then transferred to Potomac, Huttonsville and finally St. Mary's. Reports he was on Lithium until he was transferred to Huttonsville. Confined for charges related to domestic violence. Denies seeing a social worker or probation officer.

Claimant was cooperative and answered in a monotone voice. Indicated willingness to attend CE [Consultative Exam] but asked it be scheduled in Wheeling, VA [sic].

A Report of Contact dated August 23, 2006, states:

Clmt alleges impairment due to Bipolar Disorder. Clmt has a history of incarcerations and was fired from his job due to sexual harassment. Clmt has no treating source so a CE was ordered. Examiner deferred diagnosis on Axis I and II. Prison records provided enough information to establish a MDI for Bipolar Disorder and Anti-Social Personality. Clmt was limited to simple repetitive tasks with no strict production demands or undue stress, away from the general public. Clmt describes his past work as a laborer in a tobacco factory as light in nature, moving boxes from place to place . . . . Claimant can return to this type of work as he described it and as it is generally performed.

(R. 146).

In a Work Activity Report he filed on September 13, 2006, Plaintiff stated that, since his alleged onset date, he had worked two days, from August 16, 2006 until August 18, 2006, as a laborer at Home City Ice, stating: "I was fired because I could not do the work." He then worked one day, from September 5, 2006 until September 6, 2006, stating he "was fired because I failed a test I was given" (R. 148). He also stated he had never received any vocational rehabilitation or employment services, but would like to get those services (R. 151).

10

On a Disability Report filed September 13, 2006, the interviewer noted he conducted the interview face-to-face with Plaintiff. He noted Plaintiff had no difficulty with the interview, but then stated:

> Clmt appeared to be anxious, always looking toward the reception area, where a friend was waiting. He appeared unkempt. Wore shorts and T-shirt and had cell phone clipped to his shorts. Clmt was going to make a phonecall while I was interviewing him, and I request for him not to. (R. 157).

On July 26, 2006, Plaintiff presented to psychologist David Bousquet, M.Ed. for a Disability Evaluation requested by the State agency (R. 211). Mr. Bousquet first noted that Plaintiff was quite reluctant to provide any type of information particularly with regard to any type of psychological problems. He reported that the only time he had been in behavioral health treatment was 2 ½ to 3 years earlier. He said he had been on Lithium. He had been transferred from jail to the hospital for 30 days because "[t]hey said I made trouble." He said in his opinion the medications did not help. He was currently taking no medications. He reported he had been charged with domestic violence. He said he had quit using drugs. He had not used cocaine or marijuana for two months. He last used alcohol two weeks earlier. He last worked two weeks earlier, stacking ice, but was dismissed after two days because "They said they didn't like [his] work." When asked what they did not like, he said, "They didn't tell me." Before that, he worked for a tobacco company for 23 years, but was fired because "[s]ome girl said I grabbed her ass." He did say there were times when he had difficulties relating with coworkers and supervisors but was unwilling to provide any specific information.

Plaintiff presented as neat and clean and casually attired. Throughout the evaluation he was defended and guarded. He denied he had any difficulties with regard to emotional or psychological functioning. He said he was able to understand the nature and purpose of the evaluation, but related

this to the examiner in a distant and shallow manner. There were times he became agitated when the examiner attempted to press him for specific and detailed information. His speech was understandable, sustainable and goal oriented, with no difficulties of rhythm, rate or volume. His associations were organized. Plaintiff's affect was appropriate. His mood was anxious at times and then at other times agitated. He had difficulty maintaining adequate eye contact. He denied appetite and sleep problems. When asked about his diagnosis of depression and bipolar disorder, he said, "I think they was wrong." He denied experiencing any symptoms associated with clinical depression. He denied tearfulness, suicidal ideation or homicidal thoughts. He stated his motivation and energy were fine. He denied mood fluctuations and there was no indication of low self-esteem. He stated he was able to relax, and usually just worried about his financial situation. He denied concentration or memory problems or any symptoms associated with anxiety.

Plaintiff described his daily activities as staying at the Salvation Army in Wheeling, West Virginia for the past three days. Prior to that he lived at his brother's house, sleeping in his car. He enjoyed reading fiction and would go visit a friend. He said he put in a lot of applications for jobs since he got out of prison. He had no visitors but did go visit his friend. He went to church. He did not have a driver's licence because it expired. When asked why he did not have a job, he answered that he was not able to find a job and that nobody would hire him. He stated that all he wanted to do was find a job, get his license, and get a car and apartment.

The psychologist found that Plaintiff showed no indication of a formal thought disorder or delusional thinking. He was fully oriented. He had difficulties being responsive during the evaluation, however. The psychologist found him defended and guarded. Plaintiff was unable to successfully interpret any of the three proverbs administered. He demonstrated some difficulty with attention and concentration and his level of effort and motivation was inconsistent.

The psychologist found that Plaintiff demonstrated a lack of insight into his psychological functioning. He repeatedly denied having any psychological or emotional problems. His reasoning and judgment seemed age appropriate, however, and he would be able to manage his own funds, and conduct his own living arrangements. The psychologist deferred any diagnosis and assessed a current GAF of 70[3] (R. 214).

The psychologist summarized his findings by stating that throughout the evaluation Plaintiff had difficulties being cooperative. He was quite reluctant to provide the psychologist with information and was seen as defended and guarded. He tended to minimize all emotional and psychiatric difficulties. His speech was understandable. His affect was appropriate. His mood at times was anxious and at times he did become agitated. He denied problems with appetite and sleep. Based on the information obtained within the interview it appeared to the psychologist that he only met the diagnostic criteria for "Diagnosis Deferred."[4] The psychologist stated that Plaintiff "was not able to provide [him] with any information that would be able to substantiate a diagnosis on Axis I or Axis II." Plaintiff was able to understand the nature and purpose of the evaluation. He demonstrated cognitive abilities that would fall in the average range. He demonstrated a lack of insight into his psychological functioning.

_____

[3]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

[4]"Diagnosis Deferred" is defined as follows:

When there is insufficient information to make any diagnostic judgment about an Axis I [or Axis II] diagnosis or condition, this should be noted as Diagnosis or Condition Deferred . . . . Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 687 (4th ed. 1994).

This is entirely different than a diagnosis of "no diagnosis." Id.

The psychologist also described Plaintiff's Work-Related mental abilities as follows:

1.  The claimant's ability to relate to others including coworkers and supervisors is seen as being mildly impaired. He did tend to relate to this examiner in a distant and shallow manner and did tend to be agitated when pressed for specific details about his background.

2.  The claimant's ability to understand, follow, and remember simple/basic instructions and/or directions is seen as being not impaired.

3.  The claimant's ability to maintain attention and concentration in order to perform simple repetitive tasks is seen as being not impaired. His ability to maintain adequate persistence and pace from an emotional and psychological perspective is seen as being mildly impaired. He did demonstrate some problems with energy and motivation during the interview.

4.  The claimant's ability to deal with stress and pressure associated with day to day work activity effectively and adequately is seen as being mildly impaired.

On August 21, 2006, Audry Todd, PhD, a State agency reviewing psychologist, reviewed the record, including the consultative examination above, and found Plaintiff had diagnoses of bipolar disorder and an antisocial personality disorder (R. 227). She found he would have moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation, each of extended duration (R. 227). She also completed a Mental Residual Functional Capacity Assessment, opining that Plaintiff would be moderately limited in his abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; maintain

socially appropriate behavior and adhere to basic standards of cleanliness and neatness; and respond appropriately to changes in the work setting. He would be markedly limited in his ability to interact appropriately with the general public.

Dr. Todd summarized her Assessment as follows:

> Clmt alleges impairment due to Bipolar Disorder. Prison records from 2003-2005 document a history of Bipolar Disorder diagnosis, mania, severe antisocial features, and at least two psychiatric hospitalizations. MER also documents history of being prescribed Lithium, Risperdal, and Eskalith. History of being disheveled and unkempt. Several Prison Sentences. Because claimant has no current [treating psychologist] CE [consultative exam] was ordered. Clmt was reluctant to provide background information with regards to psychological problems. Examiner reports clmt had difficulty being cooperative through the evaluation. He was quite reluctant to provide the examiner with information and was seen as defended and guarded. He tended to minimize all emotional and psychiatric difficulties. His speech was understandable; affect was appropriate; mood at times was anxious and at times he became agitated. He was able to understand the nature and purpose of the exam. He demonstrated cognitive abilities that would fall within the average range. He was oriented in all spheres and was able to recall 4 digits forward and 3 backwards. He responded correctly to 3/5 arithmetic problems. He appeared easily agitated and related to examiner in a distant and shallow manner. He exhibited some problems with subtracting serial 7's. He was able to recall 3/3 objects after 5 minutes. He demonstrated a lack of insight into his psychological functioning. Reasoning and judgement capacities are at age appropriate levels. Enjoys reading fiction, visits with a friend, and has applied for many jobs since he was released from prison. CE provided "Diagnosis Deferred" for both Axis I and Axis II and offered recommendations of mild limitations in relevant domains. (Based on a review of the MER, these recommendations appear to slightly understated [sic] the severity of claimant's impairments.) Clmt repeatedly denied the presence of psychological problems to CE– based on the MER, his presentation suggests a significant minimization of his psychological impairment. Nonetheless, he would be capable of simple repetitive tasks in a setting without strict production demands or undue stress. His mood lability and antisocial tendencies would prevent him from working effectively with the public.

(R. 233).

Dr. Todd's opinion was affirmed by State agency reviewing psychologist Michael Wagner, PhD on October 19, 2006. (R. 235).

15

On January 4, 2007, Plaintiff presented to Northwood Health Systems to "help [him] get [his] life back together" (R. 243). He was living at a homeless shelter. The examiner noted Plaintiff laughed inappropriately during the interview, endorsed strong religious convictions, and reported feelings of suspiciousness and paranoid thinking. He was not suicidal or homicidal. He showed poor self esteem and became easily frustrated. He reported no violence and limited feelings of hostility, saying he "just want[ed] to be left alone," and was "tired of being treated like a piece of dirt." The examiner referred him to the Crisis Unit "which he immediately decline[d]." He stated that his only interest was being screened for being restarted on his medications.

The examiner found Plaintiff was fully oriented, his speech was rapid, his appearance was disheveled, his thought content exhibited flight of ideas, his memory was within normal limits and his sociability was inappropriate (at a level 8 out of 9– 9 being severe). The examiner also found Plaintiff had exhibited mild hostility and violence for the past year; severe oppositional behavior for the past year; moderate impulsivity and poor judgment for the past year; moderate delusions and paranoia for the past year; moderate suspiciousness for the past year; mild crying for the past year; and moderate agitation for the past year. The evaluator rated the severity of his symptoms as 6 on a scale of 1- 9.

The examiner diagnosed Plaintiff with an Adjustment Disorder, Disturbance of Conduct, with a current GAF of 50 (R. 250).[5]

On January 10, 2007, Plaintiff presented to Northwood for a Psychiatric Evaluation (R. 237).

---

[5]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

He was currently living in a homeless shelter and had presented to "get his life back together." He reported being diagnosed as bipolar in 2003, but said he was currently asymptomatic. He currently denied depression, mood swings, anger, irritability, anxiety, paranoia, suspiciousness, suicidal or homicidal thoughts or mania. He reported enjoying being alone, and did not like to be bothered by people. He did not want to deal with people and preferred being by himself. He was also distrustful of people and reported being taken advantage of.

Plaintiff reported that he had been transferred to the hospital from the jail in 2003. He was diagnosed as bipolar and put on Lithium at that time. He remained on Lithium for one year, while in Belmont Jail, until he got to Huttonsville, when the Lithium was stopped. He reported that when he was on Lithium he felt better and "mellowed out." He denied suicide attempts. He reported previously using a six pack of beer daily, stopped voluntarily. He said he now drank only sporadically. He used marijuana daily.

Regarding Plaintiff's Social History, he said that while at a football game in May 2003, his nine year old daughter was playing in the mud. He grabbed her by the neck to make her stop. Onlookers saw and called the Moundsville Police. He had words with an onlooker and was taken to jail, where he spent two and a half years. He reported that the nine year old daughter lied to his ex-wife, stating that he had tried to choke her. He was released from prison in May 2006, and had been trying to get his life back together, praying and reading the bible. He had some contact with his children but none with most of his siblings. He was not employed and had no support system or friends. He lived at the shelter and went to the library daily. He enjoyed reading. He reported that at times he wished God would just take his life because it changed so dramatically. He wanted to find a job and resume contact with his family.

The examiner found Plaintiff was defensive while discussing his relationship problems, and reported feeling victimized by his siblings, his daughter, his ex-wives, and society in general. He denied any wrongdoing himself in any situation. He made sarcastic remarks and was repetitive in his explanations. For the most part he was cooperative when answering questions, although reserved and guarded. He did behave irrationally at times.

The examiner diagnosed Plaintiff as Bipolar, Unspecified. (Axis I); Axis II deferred, with a GAF of 38.[6]

On January 24, 2007, Plaintiff followed up with a Nurse Practitioner, who noted that Plaintiff had a know or suspected behavioral health diagnosis, "and it has been determined that there is a need for psychotropic medications, therefore such has been prescribed." Plaintiff had gone back on Lithium after the last visit two weeks earlier. He said he was feeling fine, denying depression, paranoia, suspiciousness or mood swings. He said his friends had commented that he was more relaxed and his anger better controlled. He felt less anger and irritability. Objectively, on mental status exam, Plaintiff was casually and appropriately dressed, though a bit unkempt. He was alert and oriented. His speech was soft and slow. He made eye contact. He answered questions appropriately and said nothing that was bizarre or inappropriate. His mood was calm and cooperative. The nurse practitioner assessed him as "stabilizing" and continued him on Lithium.

Plaintiff followed up with the nurse practitioner on February 7, 2007 (R. 286). He continued on his medication as prescribed. He had low Lithium levels, but assured the nurse that he was

---

[6] A GAF of 31-40 indicates: "**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.) Dorland's, supra, at 32. (Emphasis in original).

compliant. He reported no symptoms and said he felt good–calm and relaxed. Objectively on mental status examination, he was casually and appropriately dressed; alert and oriented; speech was clear; and he made eye contact. He answered questions appropriately, but was repetitive and dwelling a lot on the past. He was calm. His mood was fair. The nurse assessed him as asymptomatic.

On February 14, 2007, Plaintiff underwent a "medical necessity assessment" for continued outpatient services (R. 287). It was noted that Plaintiff took his medications without assistance and that the current protocol effectively reduced his symptoms and aided his functioning. His current mental status was listed as fully oriented, with rapid speech, disheveled appearance, flight of ideas, inappropriate sociability, and normal memory. The evaluator reported moderate inappropriate affect for the past one to 90 days; moderate agitation for the past year; mild crying for the past year; moderate suspiciousness for the past year; and moderate paranoia, delusions, impulsivity and withdrawal for the past year. She also reported severe oppositional behavior for the past year.

On a functional assessment chart, Plaintiff stated he could maintain adequate grooming and a healthy diet and make and keep necessary appointments, but the staff disagreed. The staff and Plaintiff agreed he could perform activities of community living. Plaintiff stated he could communicate clearly "somewhat" and ask for help when needed "somewhat typically." He believed he could respond to other's social contact, form and maintain a social network, and engage in social/family activities, but the staff disagreed. Plaintiff stated he could never effectively handle conflict with others and the staff agreed. Regarding concentration and task performance Plaintiff said it was somewhat typical for him to perform these procedures and the staff agreed. The staff reported Plaintiff had verbally assaulted others "several times per week," threatened physical harm

to others "once," and created a public disturbance once.

Plaintiff was diagnosed with an Adjustment Disorder, Disturbance of Conduct and a GAF of 50 (R. 294). The staff found Plaintiff would need substantial assistance with activities of daily living, management of free time, maintaining relationships, access to health care, and access to other services. He could manage his own finances, administer medications, and maintain school/work.

Plaintiff followed up with his nurse practitioner on March 7, 2007, at which time he reported taking his Lithium as prescribed (R. 300). He was still living at the shelter and was looking forward to meeting with the Housing Authority to get a place. He said his mood was good. He was mellow and level. He occupied his time by going to the library and reading. He denied irritability or agitation, and said he was staying out of trouble. He denied depression or anxiety and said he was doing very well. Objectively on mental status examination, Plaintiff was casually and appropriately dressed but again poorly groomed. He was alert and oriented and his speech was clear. He made eye contact and answered questions appropriately, saying nothing that was bizarre or inappropriate. He mood was good. The nurse assessed Plaintiff as stable on medication without side effects.

Plaintiff followed up as scheduled on April 4, 2007 (R. 302). He continued his medication as prescribed. He said he was more mellow. He was staying at the Salvation Army and hopeful of getting housing in the future. He remained calm and had not had any outbursts. Objectively, on mental status examination, Plaintiff was casually and appropriately dressed and alert and oriented. His speech was clear and he made eye contact. He answered questions appropriately and said nothing bizarre or inappropriate. His mood was fair. He was diagnosed as stable on lithium.

Plaintiff followed up at Northwood on May 31, 2007 (R. 304). He was still looking for a job and housing. He reported taking his medications as ordered. He denied depression, anger,

irritability, mood swings or anxiety, and said that he felt he was doing well. Objectively, he was casually and appropriately dressed and alert and oriented. His speech was clear and he made eye contact. He answered questions appropriately and said nothing that was bizarre or inappropriate. His mood was good and he was polite and cooperative. He was assessed as stable on Lithium.

On June 4, 2007, Plaintiff was evaluated for an individual treatment plan for his current diagnosis of Adjustment Disorder, Disturbance of Conduct (R. 305). The summary of the plan was that Plaintiff had been compliant with medical services during the review period. He felt that medications were working well, and aided his mellow/leveled mood. He denied irritability and agitation with others. He continued to be homeless, but would be working with the Housing Authority to find a place to live. Treatment (med checks) were recommended continued to aid in the management of mood stability.

Plaintiff followed up at Northwood on June 28, 2007, stating he continued on the medication as prescribed (R. 309). He was concerned about being called into court for back child support. He was "asking why he takes Lithium. He doesn't feel he needs it." He denied any problems with hallucinations, suicidal or homicidal ideation. He denied any problems. Objectively on mental status examination, Plaintiff was casually and appropriately dressed, alert and oriented. His speech was clear and he maintained eye contact. He said nothing that was bizarre or inappropriate and he was polite and cooperative. His mood was good. The assessment was Bipolar Symptoms stable.

A review of Plaintiff's case was undertaken on August 8, 2007 (R. 311). Under Summary, the evaluator stated that Plaintiff was continuing to be compliant with his medications, and denied irritability or agitation. He appeared in a good mood and was appropriately dressed. He remained compliant despite contending that he did not need his medication anymore. It was recommended that

Plaintiff continue to attend his scheduled med checks as well as remain compliant with taking his medication in order to keep down his level of aggression and stabilize his mood.

The Administrative Hearing was held on September 13, 2007 (R. 23). The first several questions and answers between the ALJ and Plaintiff were transcribed as follows:

Q:    Sir, I'm going to ask you some questions about your age, education, and your work experience and why - -

A:    Okay.

Q:    - - you're not able to work. If I ask you a question and you don't understand it tell me you don't understand the question, what about the question - -

A:    Okay.

Q:     - - you don't understand and we'll try to resolve any problem in that regard.

A:    Okay.

Q:    If you need to get up or move around during the course of the hearing in order to be comfortable you can do that without asking me but you still need to stay fairly close - -

A:    Okay.

Q:    - - to the microphone, speak in a fairly loud tone. I'm going to be asking you some questions about your age, education and your work experience and - -

A:    Okay.

Q:    - - why you're not able to work. I'm also going to be, there is some indication of drug or alcohol use in the file so I'm going to be asking you some questions about whether you still are using any drugs or alcohol and if so how much, if you had treatment to keep you, help you stop the use of drugs or alcohol. I'm going to ask you about that, what the effects of

those treatment have been.

A:     Okay, whatever you want to do.

Q:     Okay, and at some point I'm going to ask you why you're not able to work and I'd like you

        to tell me then what you feel is the most serious problem and how - -

A:     Okay.

Q:     - - that affects your ability to work, sit, stand, lift, carry concentrate.  If you have more than

        one problem, then I'd like you to go through those in the order that you thing they're most

        serious to least serious.

A:     Okay.

Q:     Tell me what they are and how - -

A:     - - Okay.

Q:      - - they affect your ability to work . . . .

(R. 27-28).

        Plaintiff testified he believed he was unable to work because he "like[d] to wander off and

d[id]n't like to stay on [his] work." (R. 48).  When asked why that made him disabled, Plaintiff

testified: "Because I don't like to stay on a job.  You know, if they want to put me on a job I don't

like to stay on it.  I leave . . . all the time . . . and they get on my ass about it."  He said he had left

his position numerous times at his tobacco company job, but they just yelled at him and did not fire

him.

        Plaintiff testified he was put back on lithium in 2006.  He was tan from "walking around."

He participated in the local 20K run that past May.  Plaintiff testified that he regularly ran a route

that was about eight miles long (R. 53).  He described his daily activities as getting up at the

23

Salvation Army in the morning, going over to Catholic Charities to eat breakfast at 9:00, then going to the library. At 11:00 he went to the soup kitchen to eat, then back up to Catholic Charities to read. He read "all the time." When he went to church he would have a coffee first, then "go up to the statute of God and [] get on [his] knees and [] pray to God." He did not socialize with anyone. He had to work to be allowed to stay at the Salvation Army, so he cleaned their windows or mopped or swept.

When working at his last job, Plaintiff belonged to the union. He said he "went to union meetings there and [] found out what the union is about." When asked what that was, he said: "Nothing. I found out that they are a bunch of assholes." When asked if that was because they did not help him get his job back, he said: "That's right."

Plaintiff was asked why he was taking Lithium (R. 54). He responded:

They say that I'm taking lithium because I have mood swings and the lithium controls my mood swings where I don't have mood swings.

Counsel then asked what kind of mood swings he had, to which Plaintiff replied:

They just say that I have mood swings where I get crazy sometimes and I do crazy things and I yell at people and I scream at people but I don't like to be like that. I like to be this settled-down person which I try to be all the time but they say sometimes that I get excited with people and I like to yell at them and tell them things that they don't want to hear.

Plaintiff said that the Lithium did settle him down. When asked how he received his prescription, Plaintiff testified:

A:    Right, well, Health Right, they only charge me $2.00 for my prescription and I went up to CVS Pharmacy to see about my prescription one time and they wanted . . . $14.00 for my prescription. I'm like wait a minute here now, you know, I though you people were supposed to help me not make it harder on me and you people want to make this hard on me.

Q:    Are you taking about the drug store?

24

A:    Yeah, and why do you want to do this? And then they said, well, okay, you can go down to Health Right and Health Right will help you out with your prescriptions for a couple dollars. Okay, that's what I want to do here. Understand? And that's what I did, I go down to Health Right whenever I get a prescription from my doctor, Monica Smith. I go down to Health Right and I take it down there.

Q:    Now, did you ever take lithium at any time prior to going to prison?

A:    Well, the way that it was here, when they sent me to Cambridge Mental Hospital, Cambridge Mental Hospital put me on the lithium and then I went back to Belmont County.

Q:    That was after you went to prison but–

A:    No.

Q:     - - I'm saying before you went to prison did you ever have, did you take lithium?

A:    This is the way that this is here. Listen to me.

Q:    All right.

A.    When I went to Cambridge Mental Hospital they put me on lithium. When I went back to Belmont County Jail I was taking the lithium and then I went down to Northern Regional Jail in Moundsville I was taking lithium and when I went to Huttonsville and to St. Mary's they said you know something? I says what? They said we're not going to give you the medicine. Really? They said, yes, that's what we decided. Okay, if that's what you decided - -

Q:    Now, you don't have to raise your voice here, okay?

A:    Well, I know but I thought, I thought that it was a state law that they had to give you your medication when you was prescribed them.

Q:    So what, did you talk to the, the warden about that?

A:    I asked them about it and they said we don't want to give you the medicine. Okay, I don't care, doesn't matter to me and then when I got out of prison I went up to Northwood and I'm seeing a doctor up there. Her name is Monica Smith and Monica Smith put me back on lithium. I take lithium now in the morning when I get up in the morning and then I take lithium again in the evening.

At the conclusion of the hearing, Plaintiff asked the ALJ how long the decision would take.

The ALJ replied that it would probably take 60 days, to which Plaintiff responded:

PL:     So, I'm supposed to live my life the way that I'm living my life now for another 60 days until you decide what you're going to do?

ALJ:    Well, I , you know how may of these claims we have?

PL:     I forgot you are busy people.

ALJ:    Well, I'm just saying there's a certain, there's a certain process we have to write up notes, we have to put it into writing.

PL:     Yeah, I understand.

ALJ:    So, I mean, I'm trying to, I'm trying to be honest with you. So, if you want, you know, that's what it's going to be.

PL:      I'll have to wait.

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not definitively engaged in substantial gainful activity since December 8, 2003, the alleged onset date (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: bipolar disorder; personality disorder (20 CFR §§ 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: He

can do no work that requires completion of more than simple, routine tasks comprised of one-to-three-step instructions; he can do no work that requires completion of a high rate of production, or high sales completion rates; he can do no work that requires contact with the general public, or more than limited (10 percent of the day or less) contact with co-workers or supervisors.

6.  The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7.  The claimant was born on July 1, 1959, and was 44 years old, which is defined as a "younger individual" within the meaning of the regulations, on the alleged disability onset date (20 CFR §§ 4040.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, there are jobs that exist in significant numbers in the nation economy that the claimant can perform (20 CFR §§ 404.1560(c), 404.1566, 416.960(c) and 416.966).

11. The claimant has not been under a "disability" as defined in the Social Security Act, from December 8, 2003 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 13-21).

## IV. DISCUSSION

### A. Motion to Supplement the Record

Plaintiff moved the Court to allow him to supplement the record with additional evidence that was not available at the time the claim was before the Administration. Defendant argues that the Court should not allow the supplementation because it was made after the Defendant's Reply brief was filed. Pursuant to Local Rule of General Procedure 83.12 (now 86.02), the case is deemed

submitted at the time the Defendant's Reply is filed. Section 405(g) of Title 42 of the United States Code provides:

> The court . . . may <u>at any time</u> order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

The undersigned therefore finds the Court is permitted to allow the supplementation. Further, the undersigned notes that this Court has in previous cases granted plaintiffs' motions to supplement the brief with submission of additional and material evidence submitted to the Court subsequent to the Defendant's Reply, and even subsequent to the entry of the Report and Recommendation. <u>See</u>, e.g., <u>Sparks v. Barnhart</u>, 2:99cv109. In that case, Defendant filed her Reply on January 10, 2000. The undersigned entered a Report and Recommendation on November 17, 2000. Plaintiff filed Objections to the Report and Recommendation on December 12, 2000. Plaintiff filed Motions to Supplement Her Brief with Submission of Additional and Material Evidence on February 4, 2002, and April 4, 2002. Defendant responded to the motions on April 22, 2002. On August 19, 2002, United States District Judge Robert E. Maxwell (also the presiding judge in this case) granted the plaintiff's two Motions to Supplement Her Brief with Submission of Additional and Material Evidence.

The undersigned therefore **GRANTS** Plaintiff's Motion to Supplement the Record.

## B. Contentions of the Parties

Plaintiff contends:

1.      The Judge erroneously characterized plaintiff's conduct at the hearing and neglected that conduct in finding the Commissioner discharged her burden of proof in finding that Falcone can make a vocational adjustment.

2.      The rejection of the State Agency conclusions of a moderate impairment in

social functioning lacks substantial evidence and is contrary to the regulatory requirement.

3. The denial lacks substantial evidence to support the credibility finding and is internally inconsistent.

4. The Appeals Council did not address the basis for appeal.

5. The denial focused on the age of the claimant at the alleged disability onset rather than the date of hearing, even conceding that Falcone at the time was a "Younger Individual," and by the time of the decision of this court and/or the expiration of his date of last insured Status, he would likely be on the cusp of a different age category.

The Commissioner contends:

1. Substantial evidence supported the ALJ's findings as to Plaintiff's functional limitations.

2. The ALJ properly found that Plaintiff had moderate limitations in concentration, persistence and pace and mild limitations in social functioning

3. Substantial evidence supported the ALJ's determination that Plaintiff was only partially credible.

4. The Appeals Council sufficiently considered Plaintiff's credibility argument in deciding not to review the ALJ's decision.

5. Substantial evidence supported the ALJ's consideration of Plaintiff's age.

## C. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345

(4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### D. Plaintiff's Conduct at the Hearing and Credibility Finding

#### 1. Plaintiff's Conduct during the hearing

Plaintiff first argues that the Administrative Law Judge misrepresented his conduct at the hearing. Defendant argues that Plaintiff's argument in this regard is "based solely on: (1) isolated statements from Plaintiff's lengthy testimony at the administrative hearing that were taken out of context; (2) Plaintiff's counsel's self-serving observations, which were provided in Plaintiff's brief to the Appeals Counsel and were not based on any evidence in the hearing transcript; and (3) sporadic accounts of Plaintiff's behavior that occurred before he was put back on lithium in January 2007, after which he never had any of these problems."

As to Plaintiff's conduct during the hearing, the ALJ stated as follows:

He was able to testify at the hearing on his own behalf, and answered clearly and cogently to questions posed to him, providing specific details of his alleged impairments and treatment.

The ALJ found Plaintiff's ability to answer clearly and cogently was a determining factor in his finding that Plaintiff was not entirely credible, particularly with regard to his allegations of limitations and overall ability. The undersigned finds the ALJ correctly found that Plaintiff answered

30

"clearly and cogently" during the hearing. Plaintiff's intelligence or ability to think or speak has never been in question, however. He is diagnosed with bipolar disorder and a personality disorder. The undersigned's review of the transcript of the hearing (which in contrast to Defendant's description of "lengthy" lasted in total less than one hour) indicates Plaintiff interrupted the ALJ and his own counsel numerous times, answering before the inquirer had finished the question. Moreover, he answered (usually just an "okay,") before enough of the question had been asked that he would have understood and been able to give a "clear and cogent" answer.

Plaintiff did also use inappropriate language several times during the hearing, stating at one point: "You know, if they want to put me on a job I don't like to stay on it. I leave . . . all the time . . . and they get on my ass about it." When asked what the union did for him, he said: "Nothing. I found out that they are a bunch of assholes."

Plaintiff also showed at the least impatience and possibly anger toward the ALJ at the hearing. When asked how he received his prescriptions, Plaintiff testified:

A:     Right, well, Health Right, they only charge me $2.00 for my prescription and I went up to CVS Pharmacy to see about my prescription one time and they wanted . . . $14.00 for my prescription. I'm like wait a minute here now, you know, I though you people were supposed to help me not make it harder on me and you people want to make this hard on me.

Q:     Are you taking about the drug store?

A:     Yeah, and why do you want to do this? And then they said, well, okay, you can go down to Health Right and Health Right will help you out with your prescriptions for a couple dollars. Okay, that's what I want to do here. Understand? And that's what I did, I go down to Health Right whenever I get a prescription from my doctor, Monica Smith. I go down to Health Right and I take it down there.

Q:     Now, did you ever take lithium at any time prior to going to prison?

A:     Well, the way that it was here, when they sent me to Cambridge Mental Hospital, Cambridge Mental Hospital put me on the lithium and then I went back to Belmont County.

Q:    That was after you went to prison but–

A:    No.

Q:    - - I'm saying before you went to prison did you ever have, did you take lithium?

A:    This is the way that this is here. Listen to me.

Q:    All right.

A.    When I went to Cambridge Mental Hospital they put me on lithium. When I went back to Belmont County Jail I was taking the lithium and then I went down to Northern Regional Jail in Moundsville I was taking lithium and when I went to Huttonsville and to St. Mary's they said you know something? I says what? They said we're not going to give you the medicine. Really? They said, yes, that's what we decided. Okay, if that's what you decided - -

Q:    Now, you don't have to raise your voice here, okay?

A:    Well, I know but I thought, I thought that it was a state law that they had to give you your medication when you was prescribed them.

At the conclusion of the hearing, Plaintiff asked the ALJ how long the decision would take.

The ALJ replied that it would probably take 60 days, to which Plaintiff responded:

PL:    So, I'm supposed to live my life the way that I'm living my life now for another 60 days until you decide what you're going to do?

ALJ:    Well, I , you know how may of these claims we have?

PL:    I forgot you are busy people.

ALJ:    Well, I'm just saying there's a certain, there's a certain process we have to write up notes, we have to put it into writing.

PL:    Yeah, I understand.

ALJ:    So, I mean, I'm trying to, I'm trying to be honest with you. So, if you want, you know, that's what it's going to be.

PL:    I'll have to wait.

32

The undersigned finds Plaintiff's testimony throughout the hearing, while "clear and cogent," also showed the same type of problems numerous mental health providers found throughout the record, such as a severe level of socially inappropriate behavior; hostility; oppositional behavior; impulsivity; poor judgment; irritability; intrusiveness; defensiveness; difficulties with cooperation; becoming easily frustrated; paranoid thinking; agitation; sarcasm; and irrational thoughts.

A Social Security employee noted during a face-to-face contact with Plaintiff he "appeared to be anxious, always looking toward the reception area, where a friend was waiting. He appeared unkempt; Wore shorts and a T-shirt and had cell phone clipped to his shorts. Clmt was going to make a phonecall while I was interviewing him, and I requested for him not to.

In argument submitted to the Appeals Council, Plaintiff's lawyer at the time stated:

> The judge makes no reference to the aggressive mannerisms of the claimant during the hearing. His behavior was such that a Federal Marshal came to the door to make sure that there were no problems . . . . . From his behavior at the hearing, it is apparent that he can have no contact with co-workers of supervisors. He was disrespectful to the Judge, used inappropriate language when speaking, and was aggressive and inappropriately close to the vocational expert and counsel.

The Appeals Council did not address this contention in its decision and Defendant characterized the argument as "counsel's self-serving observations, which were provided in Plaintiff's brief to the Appeals Counsel and were not based on any evidence in the hearing transcript."

The undersigned does not find the failure to address this contention reversible error on its own, but has a difficult time believing that counsel would misrepresent what she felt happened at the hearing. Further, the description of Plaintiff's behavior during the hearing is totally consistent with that found by professional health care providers and even Plaintiff's fellow inmates at prison.

## 2. Credibility Finding

Plaintiff also argues that the ALJ's credibility finding is unsupported by the evidence and is

internally inconsistent. Defendant contends that substantial evidence supported the ALJ's

determination that Plaintiff was only partially credible. The Fourth Circuit has held that "[b]ecause

he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the

ALJ's observations concerning these questions are to be given great weight." <u>Shively v. Heckler</u>,

739 F.2d 987, 989 (4th Cir.1984) (<u>citing</u> <u>Tyler v. Weinberger</u>, 409 F.Supp. 776 (E.D.Va.1976)).

The ALJ's credibility finding is as follows:

> The claimant is not entirely credible, particularly with regard to his allegations of
> limitations and overall disability. The claimant's allegations of extreme limitations
> are undercut by his description of daily activities which include going to a library and
> reading on occasion, going to church, and staying at a Salvation Army shelter. He
> indicated that he is able to run about eight miles every other day and competed in a
> 20-kilometer race. He was able to testify at the hearing on his own behalf, and
> answered clearly and cogently to questions posed to him, providing specific details
> of his alleged impairments and treatment. After considering the evidence of record,
> the undersigned finds that the claimant's medically determinable impairments could
> reasonably be expected to produce the alleged symptoms, but that the claimant's
> statements concerning the intensity, persistence and limiting effects of these
> symptoms are not entirely credible.

This case is unusual, in that Plaintiff consistently asserts that he is not disabled and does not

have a mental impairment. He states that he looks for work, although the undersigned is not sure

this is true. As the State agency reviewing psychologist noted, Plaintiff "repeatedly denied the

presence of psychological problems to [the consultative examiner] -- based on the [medical evidence

of record] his presentation suggests a <u>significant minimization </u>of his psychological impairment."

(Emphasis added). While this may indeed make Plaintiff's statements about his limitations not

entirely credible, the undersigned finds the incredibility actually supports the limitations alleged by

Plaintiff. Had Plaintiff been exaggerating his symptoms to obtain disability, it seems unlikely he

would tell one Social Security One employee when he applied for benefits that he didn't understand

this bipolar disorder and didn't know how it affected his ability to work and a second that he did not

understand the condition and did not know if it would prevent him from working. When another agency employee asked him to describe his current symptoms and explain how his impairments affected him, he responded, "nothing." He said he had no symptoms of bipolar disorder. He also told that employee that he spent all day every day looking for work and filling out applications.

The first psychiatrist who ever saw Plaintiff (years before he filed for disability) opined that Plaintiff had little insight into his condition and his judgment was impaired. Upon his release from the mental hospital it was still noted that Plaintiff "lack[ed] insight into his mental illness and is completely in denial of some of the events of his life . . . ." He had not received any vocational rehabilitation or employment services, but indicated to the agency that he would like to get those services.

Plaintiff also consistently stated he did not believe he needed to be on medication. He said he was "feeling great," while objectively exhibiting rapid speech, labile affect, elevated mood, quick periods of aggressive behavior followed by elevated "happy" mood, and then crying briefly before laughing again. A psychologist opined that Plaintiff was "highly manic even though he sees no need to be placed back on medication." Shortly before filing his applications Plaintiff told a psychologist the only reason he had been sent to the mental institution was because he "always wanted to see what it was like." The psychologist found his judgment impaired and his insight poor. He denied any difficulties with regard to emotional or psychological functioning at his consultative examination in July 2006. When asked about his diagnosis of depression and bipolar disorder he said, " I think they was wrong." When asked why he did not have a job, he stated that he was not able to find a job and no one would hire him. He stated that all he wanted to do was find a job, get his driver's license, and get a car and apartment. The psychologist again found Plaintiff demonstrated a lack of insight

into his psychological functioning, repeatedly denied having any psychological or emotional problems, and "tended to minimize all emotional and psychiatric difficulties." State agency reviewing psychologists Todd and Wagner both found that Plaintiff's presentation suggested a significant minimization of his psychological impairment. In January 2007, Plaintiff told a psychiatrist that he was currently asymptomatic. That psychiatrist found Plaintiff was defensive, made sarcastic remarks, and was repetitive in his explanations. While cooperative when answering questions, he behaved irrationally at times.

Plaintiff also reported several times that he had no problems with past co-workers or bosses and was able to complete job tasks on time without supervision, despite the fact he was fired for sexual harassment, and reported he left his work station all the time, for which he was "yelled at."

The ALJ also considered Plaintiff's self-reported "daily activities" in concluding that he was not entirely credible. The activities that "undercut" his "allegations of extreme limitations" included going to a library and reading on occasion, going to church, and staying at a Salvation Army shelter, running about eight miles every other day and competing in a 20-kilometer race. The undersigned disagrees that these activities undercut Plaintiff's allegations of a mental disorder, especially a bipolar disorder. According to the DSM-IV, "the majority of individuals with Bipolar I Disorder return to a fully functional level between episodes" and "it is a recurrent disorder." Therefore, it is normal for an individual to be able to function at times, yet the episodes can vary in frequency.[7]

Based on all of the above, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not entirely credible with regard to his allegations of limitation and overall disability.

---

[7]. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 353 (4th ed. 1994)

## E. Rejection of State Agency Psychologists' Opinions

Plaintiff next argues that the ALJ improperly rejected the State agency psychologists' opinions that Plaintiff would have moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation, each of extended duration. Defendant contends the ALJ properly found that Plaintiff had moderate limitations in concentration, persistence and pace and mild limitations in social functioning.

Regarding the B criteria of the Listings, the ALJ found as follows:

The first area of the Part "B" criteria are activities of daily living, which generally include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office. The claimant stays at a shelter, but indicated that he was able to do some activities to help, in addition to maintaining his personal hygiene, while looking for work. The objective medical evidence thus shows that the claimant's limitations on daily activities are no more than "mild."

First, the undersigned disagrees that the Plaintiff's own statements can be categorized as "objective medical evidence." Even if they were, there is absolutely no evidence Plaintiff does any of the activities the ALJ listed. He lived, throughout the entirety of the case, in prison, at the Salvation Army, in a car at his brother's house, or in a homeless shelter. There is no evidence he cleaned, shopped, cooked, paid bills or maintained a residence. According to numerous professional mental health providers he was often unkempt and had poor grooming (although at times his appearance and grooming were appropriate). While he did apparently use the telephone in prison, he also monopolized it to the point where other inmates complained. Further, there was a question at the prison as to whether he was really talking on the phone to his wife or anyone, since he said he was talking to her, but there was no record of calls to her home, and Plaintiff later denied calling her.

The undersigned therefore does not find substantial support for the ALJ's determination that Plaintiff would have only "mild" limitations on daily activities.

The ALJ continued:

> The second area of the "B" criteria, "social functioning", refers to the claimant's capacity to interact independently, appropriately, effectively and on a sustained basis with other individuals. The claimant has a significant history of antisocial behavior, including domestic violence, which appeared to have resulted in his incarceration More recently, however, the claimant appears to be stable while being treated with lithium, and his mental health providers indicate that his antisocial tendencies have been addressed with medication, through a State Agency reviewing psychologist noted that the claimant had "moderate" limitations . . . . The objective medical evidence thus shows that the claimant's limitations on social functioning are no more than "mild."

In January 2007, within a year prior to the hearing and decision, an examiner recommended Plaintiff be referral to the "Crisis Unit," which Plaintiff turned down. The examiner then found Plaintiff had exhibited mild hostility and violence for the past year; severe oppositional behavior for the past year; moderate impulsivity and poor judgment for the past year; moderate delusions and paranoia for the past year; moderate suspiciousness for the past year; and moderate agitation for the past year. A follow-up psychiatric evaluation showed Plaintiff as defensive, feeling victimized by his family and society in general. He denied any wrongdoing himself in any situation, made sarcastic remarks, and was repetitive in his explanations. For the most part he was cooperative, although reserved and guarded, but he "did behave irrationally at times." He was given a GAF of 38 (some impairment in reality testing or communications or major impairment in several areas). Plaintiff reported enjoying being alone, not being "bothered" by people. He did not want to deal with people and preferred being by himself. He was distrustful of people. At the same time, Plaintiff himself said he was "currently asymptomatic." He denied depression, mood swings, anger, irritability, anxiety, paranoia, suspicious, or mania.

After being restarted on Lithium, a nurse practitioner found Plaintiff was appropriately dressed, though a bit unkempt; alert and oriented; and said nothing that was bizarre or inappropriate. She assessed him as "stabilizing." Two weeks later he was appropriately dressed, alert and oriented; and made eye contact. He answered questions appropriately, but was repetitive and dwelled a lot on the past. His mood was fair. The nurse assessed him as "asymptomatic."

At a medical necessity assessment only a few weeks later, Plaintiff's mental status was fully oriented, with rapid speech, disheveled appearance, flight of ideas, inappropriate sociability and normal memory. Notably, where Plaintiff wrote that he could maintain adequate grooming and a healthy diet and make and keep necessary appointments, the "staff" indicated they disagreed. Plaintiff believed he could respond to other's social contact, form and maintain a social network, and engage in social/family activities, but the staff again disagreed. Plaintiff said he never could handle conflict with others, and the staff agreed. Plaintiff was diagnosed with an adjustment disorder, disturbance of conduct and a GAF of 50. The staff found he would need substantial assistance with activities of daily living, management of free time, and maintaining relationships.

While the medical necessity assessment was performed by a clinician, it was reviewed and signed by a psychologist.

From March through August, Plaintiff, continuing on his Lithium, was assessed as "stable" by the nurse practitioner during his once-or twice-monthly 15-minute med checks. During this time his mood was fair to good. He often said, however, he did not know why he was on Lithium, or that he did not need it, but he apparently complied with his medications.

The ALJ apparently found Plaintiff's limitations on social functioning "mild" based on the med checks performed by the nurse practitioner. Notably, these med checks are expressly limited

to 15 minutes in length, once or twice a month. The entirety of the final med check "Content" is as follows:

> Mark is here for a follow up visit and med check. He continues on the medication as prescribed. He's concerned about being called into court for back child support. He is asking why he takes Lithium. He doesn't feel he need it. He does not have any problems with hallucinations, suicidal or homicidal ideation. He denies any problems.

> Objectively on mental status, he is casually and appropriately dressed. He's alert and oriented. Speech is clear. He established and maintained eye contact. He said nothing that was bizarre of inappropriate. His mood was good. He was polite and cooperative.

> Assessment: bipolar symptoms stable.

A nurse practitioner is not an acceptable medical source under the Regulations, but instead is an "other source." See 404.1513. The ALJ may consider an "other source," but in this case he did not indicate what, if any, weight he gave the nurse or any of the providers in the record except for the State agency reviewing psychologist . As the Fourth Circuit stated in Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984):

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. *See, e.g., Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977). As we said in *Arnold*: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

The ALJ did discuss the findings of the State agency reviewing psychologist, who found that

Plaintiff would have moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation, each of extended duration (R. 227). She also completed a Mental Residual Functional Capacity Assessment, opining that Plaintiff would be moderately limited in his abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of cleanliness and neatness; and ability to respond appropriately to changes in the work setting. He would be markedly limited in his ability to interact appropriately with the general public.

Dr. Todd summarized her Assessment as follows:

Clmt alleges impairment due to Bipolar Disorder. Prison records from 2003-2005 document a history of Bipolar Disorder diagnosis, mania, severe antisocial features, and at least two psychiatric hospitalizations. MER also documents history of being prescribed Lithium, Risperdal, and Eskalith. History of being disheveled and unkempt. Several Prison Sentences. Because claimant has no current [treating psychologist] CE was ordered. Clmt was reluctant to provide background information with regards to psychological problems. Examiner reports clmt had difficulty being cooperative through the evaluation. He was quite reluctant to provide the examiner with information and was seen as defended and guarded. He tended to minimize all emotional and psychiatric difficulties. His speech was understandable; affect was appropriate; mood at times was anxious and at times he became agitated. He was able to understand the nature and purpose of the exam. He demonstrated cognitive abilities that would fall within the average range. He was oriented in all spheres and was able to recall 4 digits forward and 3 backwards. He responded correctly to 3/5 arithmetic problems. He appeared easily agitated and related to examiner in a distant and shallow manner. He exhibited some problems with subtracting serial 7's. He was able to recall 3/3 objects after 5 minutes. He demonstrated a lack of insight into his psychological functioning Reasoning and

41

judgement capacities are at age appropriate levels. Enjoys reading fiction, visits with a friend, and has applied for many jobs since he was released from prison. CE provided "Diagnosis Deferred" for both Axis I and Axis II and offered recommendations of mild limitations in relevant domains. (Based on a review of the MER, these recommendations appear to slightly understated [sic] the severity of claimant's impairments.) Clmt repeatedly denied the presence of psychological problems to CE– based on the MER, his presentation suggests a significant minimization of his psychological impairment. Nonetheless, he would be capable of simple repetitive tasks in a setting without strict production demands or undue stress. His mood lability and antisocial tendencies would prevent him from working effectively with the public.

Dr. Todd's opinion was affirmed by State agency reviewing psychologist Michael Wagner, PhD on October 19, 2006.

20 CFR § 404.1527(f)(2)(I) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Regarding the State agency psychologists' opinions, the ALJ stated:

The undersigned has considered these opinions and, to the extent that they show that the claimant's ability to perform exertional work or non-exertional work requirements are not grossly restricted, and to the extent that the opinions seem consistent with the majority of the objective findings in the medical evidence, the undersigned agrees with them.

The undersigned finds this explanation of the weight accorded the State agency psychologists' opinions is insufficient on its face under the Regulations, although he clearly rejected them, at least in part. Nor does the ALJ indicate the weight he accorded other treating and examining providers, as required.

The undersigned therefore finds substantial evidence does not support the ALJ's findings

regarding the "B" criteria of the listings.

## F. Appeals Council Decision

Plaintiff next argues the Appeals Council did not address the argued basis for appeal. Plaintiff had not submitted any new evidence to the Appeals Council, but argued that the ALJ committed clear and substantive error of law, in particular due to the evidence that his GAF was consistently 50 or lower; that he was living in a homeless shelter; and based on his aggressive mannerisms during the hearing. Because the undersigned recommends the claim be remanded to the Commissioner based on the ALJ's decision, the undersigned does not address the Appeals Council's action.

## G. Plaintiff's Age

Plaintiff lastly argues that the ALJ erred by referring to Plaintiff's age at the time of his alleged onset date instead of at the time of the administrative hearing or the ALJ's decision. The undersigned agrees that the ALJ erred by only using Plaintiff's age at his onset date rather than at the administrative hearing; however, Plaintiff was 44 on his alleged onset date and 48 at the time of the administrative hearing and the decision. Plaintiff was therefore at all times relevant to the decision, a "younger individual." See 20 CFR §§ 4040.1563 and 416.963. His limitations were solely mental and not exertional. The regulations provide, in pertinent part:

> We will use each of the age categories that applies to you during the period for which we must determined if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the old age category after evaluating the overall impact of the factors in your case.

404.1563(b), 416.963(b).

Plaintiff was not within a few days to a few months of reaching 50 at the time of the

43

administrative decision. Nor does the undersigned find using the older age category would result in a determination or decision that Plaintiff was disabled. The undersigned therefore does not find the ALJ committed reversible error by using Plaintiff's age at his alleged onset date, as the result would have been the same.

### H. Evidence Submitted to the Court.

Plaintiff's Motion to Supplement the Record has already been granted. Because the undersigned has already found that this case should be remanded to the Commissioner based on the ALJ's decision, however, the undersigned need not and does not consider the new evidence submitted to the Court. Insofar as Plaintiff's Motion to Supplement may be construed as a Motion to Remand for New and Material Evidence under sentence six of 42 U.S.C. 405(g) and 1383(c)(3), the undersigned recommends that Motion be **DENIED AS MOOT**.

### V. Recommended Decision

For the reasons above stated, Plaintiff's Motion to Supplement the Record [Docket Entry 14] is **GRANTED**. Insofar as that Motion may be construed as a Motion for Remand for New and Material Evidence to the Court, under sentence six of 42 U.S.C. 405(g) and 1383(c)(3), the undersigned recommends that Motion be **DENIED AS MOOT**.

The undersigned finds substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and SSI. I accordingly recommend that Defendant's Motion for Summary Judgment [Docket Entry 12] be **DENIED,** Plaintiff's Motion for Summary Judgment [Docket Entry 13] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation, and that

this action be **DISMISSED and RETIRED** from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _15_ day of August, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE